

# NUMBER 13-22-00220-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

---

## IN THE INTEREST OF K.C.W., A CHILD

---

**On appeal from the County Court at Law No. 5
of Nueces County, Texas.**

---

## MEMORANDUM OPINION

**Before Justices Longoria, Hinojosa, and Silva
Memorandum Opinion by Justice Silva**

Appellant Trish appeals the trial court's order terminating the parent-child relationship between her and her son, Kody.[1] By her sole issue, Trish argues the evidence was legally and factually insufficient to support the trial court's finding that termination was in the child's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). We affirm.

---

[1] We refer to the parties and children by aliases in accordance with the rules of appellate procedure. *See* TEX. R. APP. P. 9.8(b)(2).

## I. BACKGROUND

On July 24, 2020, Texas Department of Family and Protective Services (Department) investigator Andrea Gonzalez testified that the Department received a report of a newborn suffering from withdrawal symptoms following a premature birth. During the investigation, Gonzalez confirmed that the drugs in Kody's system—methadone and Xanax—were prescribed to Trish by her physician. However, the Department discovered that Trish's paramour, Kody's father, Steve,[2] was on parole for a federal conviction for possession of child pornography. Trish and Steve resided together at the time of Kody's birth.

Trish initially testified that Kody was born at approximately seven months' gestation but subsequently claimed that it was twenty-two weeks' gestation and denied using any non-prescribed medication during her pregnancy. The Department submitted Trish's medical records from Kody's birth, which included records that showed that during a February 3, 2020 prenatal visit, she tested positive for "[m]eth" but negative for "[o]piates." Trish denied that she was pregnant in February 2020 or received prenatal care at that time. The records also indicated that Kody's estimated gestational age at birth was thirty-three weeks and one day.[3] The Department ultimately sought and obtained temporary managing conservatorship of Kody and this case ensued.

Two Department conservatorship workers assigned to this case testified at trial:

---

[2] The parent-child relationship between Steve and Kody was terminated following Steve's execution of an affidavit of voluntary relinquishment. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(K). Steve is not a party to this appeal.

[3] This would have made December 5, 2019, Kody's estimated conception date.

Jacquelyn Jordan and Natalie Rincon. Jordan originally served as Trish's conservatorship worker, but after she was promoted to supervisor, her protégé, Rincon, assumed the role. Jordan and Rincon individually testified that Trish failed to complete all the requirements of her court-ordered service plan. Specifically, Jordan expounded that Trish failed to complete individual counseling, substance abuse classes, and missed several requested drug tests. Jordan acknowledged that Trish completed a psychological evaluation, substance abuse assessment, and parenting classes as required. Rincon similarly testified that Trish failed to complete individual and drug counseling services, missed several drug tests, and failed to attend numerous in-person visits with Kody. Rincon specified that Trish attended fifteen of ninety-seven offered visits over a period of thirteen months, but conceded Trish initially had visits through Kody's foster mother that the Department did not track. Further, Rincon stated that out of seventy-four offered drug tests, Trish failed to appear at forty-three of them.

Rincon recounted various excuses that Trish offered to explain missing visits and drug tests throughout the case, including claims that she contracted hand, foot, and mouth disease and COVID-19 on two separate occasions, and needed to refill medications. At trial, Trish denied ever having hand, foot, and mouth disease or COVID-19. Despite Trish's failure to complete services, at one point during the case she was permitted unsupervised visits with Kody for the progress she had made. However, Rincon testified that shortly after the visits began, Trish admitted to Rincon that she relapsed on methamphetamine with Steve. Consequently, the Department requested, and the trial court ordered, that Trish's unsupervised visits cease, and that she attend drug court. Trish

3

signed an agreement with the Department which provided that if she was not accepted into drug court, she would attend a drug detox program. Rincon explained that Trish was ultimately not eligible for drug court but never attended the drug detox program. To reestablish her unsupervised visits, the trial court ordered Trish to complete weekly drug testing and attend every visit allowed. According to Rincon, Trish missed a drug test two days after the trial court's order.

A few months after Kody's removal, the Department filed a motion requesting a finding of aggravated circumstances for Steve, which would permit the Department to proceed without offering reunification services to Steve. *See id.* § 262.2015. At trial, Trish initially testified that she was unaware of Steve's conviction because he claimed that the charges had been "thrown out." Trish thereafter admitted that she became aware of his conviction at the aggravated circumstances hearing. During the trial, Trish subsequently explained that Steve's parole officer came to their home prior to Kody's birth to provide her and Steve with requirements as part of Steve's federal parole. According to Trish, after the aggravated circumstances hearing, she terminated her relationship with Steve. However, approximately four months prior to trial, Rincon observed Steve in Trish's car after taking her to a nail salon. When asked about Steve driving her, Trish testified that she asked him because she could not find her glasses to drive and did not use a rideshare app because she was being frugal. Nona Lynn Baeza, Kody's foster mother, countered that approximately one month before trial, Trish was unable to meet up with her because Trish contracted an illness from Steve. Baeza further testified that Trish claimed when Jordan was in Trish's home, Steve was hiding in a closet to prevent the Department from

4

discovering he was there. Baeza observed Steve with Trish at her home on other occasions after the aggravated circumstances hearing. Steve was listed as an insured driver on Trish's automobile insurance, which was obtained about eleven months after the aggravated circumstances hearing.

Trish claimed to have provided Baeza with diapers and clothing for Kody on several occasions, as well as allowing Baeza to use Trish's food stamp card to purchase food for Kody. Trish estimated that she had given Baeza diapers for Kody twenty times. Trish also stated that she allowed Baeza to use the food stamp card "[a]bout every month." Conversely, Baeza testified that Trish provided diapers "[n]o more than eight times," some of those times including the wrong size or type of diaper. Baeza further claimed that Trish only provided clothing for Kody twice, some of which were the wrong size. Finally, Baeza said that she was provided Trish's food stamp card to buy groceries for Kody on four occasions. According to Baeza, Kody had monthly doctor's appointments that Trish could attend, but she only attended one during the pendency of the case.

Trish testified that she had maintained her residence since shortly after Kody's birth; she was additionally approved for housing assistance, pending recertification based on whether Kody would return home to her. Trish received an inheritance, held in trust, worth about $100,000 that would disburse three months after trial. Trish additionally obtained food stamps and electricity payment assistance. On the other hand, Trish explained that she had "worked at IHOP for about a week," Texas Roadhouse "for a few weeks," and as a caregiver for a gentleman who lived in her building for "about four months." Trish acknowledged that she had claimed to work two additional jobs during the

5

case that she never actually worked. At trial, Trish claimed that she "just started" a job at Subway, but later clarified that she would be starting there soon. Rincon testified that the man Trish purported to be a caregiver for was "a known methamphetamine[] user."

Baeza testified that she has been Kody's caregiver for nearly a year and a half. Trish asked Baeza to serve as Kody's foster mother until he could be returned home. Although Baeza was not recommended for placement by the Department due to an unfavorable home study, the trial court ordered Kody be placed with her as a fictive kinship placement. Both Jordan and Rincon expressed that they have no concerns regarding Kody's well-being and care in the home, noting that Kody and Baeza are well bonded. Baeza described the daily routine that she and Kody have, explaining that "he's just a part of [her] life every day." Trish communicated some concerns about Baeza's age as she was turning seventy years old soon and may not be a viable long-term placement. Nonetheless, Trish proposed the trial court consider appointing Baeza as Kody's conservator and establishing supervised visits as an alternative to termination. Baeza explained that she has established respite care for Kody with a family she knows from church, that Kody sees weekly.

Rebecca Wilson served as Kody's guardian ad litem. Wilson testified that she believed termination was in Kody's best interest. Wilson primarily based her recommendation on Trish's continued relationship with Steve and unstable lifestyle. Wilson further agreed that Trish's continued drug use and failure to complete her service plan were also concerns.

The Department presented additional evidence that Trish had voluntarily

6

relinquished her rights to her two other children, whom the Department had previously removed due to her ongoing drug use.

The trial court terminated Trish's parental rights to Kody, finding multiple predicate grounds for termination and that termination was in Kody's best interest. *See id.* § 161.001(b)(1)(D), (E), (N), (O), (P), and (R) (predicate grounds); *id.* § 161.001(b)(2) (best interest). This appeal followed.

## II. STANDARD OF REVIEW AND APPLICABLE LAW

### A. Standard of Review

"[I]nvoluntary termination of parental rights involves fundamental constitutional rights" and divests the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit from the parent. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (quoting *In re G.M.*, 596 S.W.2d 846, 846 (Tex. 1980)); *In re L.J.N.*, 329 S.W.3d 667, 671 (Tex. App.—Corpus Christi–Edinburg 2010, no pet.); *see In re K.M.L.*, 443 S.W.3d 101, 121 (Tex. 2014) (Lehrmann, J., concurring) ("Termination of parental rights, the total and irrevocable dissolution of the parent-child relationship, constitutes the 'death penalty' of civil cases."). Accordingly, termination proceedings must be strictly scrutinized. *In re K.M.L.*, 443 S.W.3d at 112.

A trial court may order termination of the parent-child relationship only if it finds by clear and convincing evidence that: (1) the parent committed an act or omission described in family code § 161.001(b)(1)(A)–(U) (predicate grounds); and (2) termination is in the child's best interests. TEX. FAM. CODE ANN. § 161.001(b)(1), (2). The "clear and convincing" standard falls between the preponderance of the evidence standard of

7

ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d at 847; *In re L.J.N.*, 329 S.W.3d at 671. It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007.

Evidence is legally sufficient to support termination if a reasonable factfinder could form a firm belief or conviction that the finding was true. *In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018). In conducting a legal sufficiency review, we assume that the factfinder resolved disputed facts in favor of its finding if it was reasonable to do so, and we disregard all evidence that a reasonable factfinder could have disbelieved or found to be incredible. *In re L.J.N.*, 329 S.W.3d at 671. We must also consider undisputed evidence, if any, that does not support the finding. *In re K.M.L.*, 443 S.W.3d at 113; *see In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002) ("Disregarding undisputed facts that do not support the finding could skew the analysis of whether there is clear and convincing evidence.").

Evidence is factually insufficient to support termination "if, in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not reasonably have formed a firm belief or conviction that the finding was true." *In re A.C.*, 560 S.W.3d at 631 (citing *In re J.F.C.*, 96 S.W.3d at 266). Under the factual sufficiency standard, we defer to the factfinder's determinations on the credibility of the witnesses "so long as those determinations are not themselves unreasonable." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam) (quoting *Sw. Bell Tel. Co. v. Garza*, 164 S.W.3d 607, 625 (Tex. 2004)); *see also*

*In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("A standard that focuses on whether a reasonable jury could form a firm conviction or belief retains the deference an appellate court must have for the factfinder's role.").

"In a bench trial, the trial court acts as the fact[]finder and is the sole judge of witness credibility." *In re A.M.*, 418 S.W.3d 830, 841 (Tex. App.—Dallas 2013, no pet.) (citing *Nguyen v. Nguyen*, 355 S.W.3d 82, 88 (Tex. App.—Houston [1st Dist.] 2011, pet. denied)). "The fact[]finder may choose to believe one witness over another, and we may not impose our own opinion to the contrary." *Id.* (citing *Nguyen*, 355 S.W.3d at 88).

## B.    Applicable Law

"The best-interest prong of the termination inquiry 'is child-centered and focuses on the child's well-being, safety, and development.'" *In re J.W.*, 645 S.W.3d 726, 746 (Tex. 2022) (quoting *In re A.C.*, 560 S.W.3d at 631). The Texas Supreme Court has identified several nonexclusive factors for courts to consider in determining the child's best interest, known as the *Holley* factors. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors include: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) the present and future emotional and physical danger to the child; (4) the parenting abilities of the individuals seeking custody; (5) the programs available to assist those individuals to promote the child's best interest; (6) the plans for the child by those individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions that may indicate the existing parent-child relationship is an improper one; and (9) any excuse for the parent's acts or omissions. *Id.* at 371–72. The legislature has identified additional factors

9

to consider when determining "whether the child's parents are willing and able to provide the child with a safe environment." TEX. FAM. CODE ANN. § 263.307(b). Evidence that is probative of grounds for termination may be probative of the best interest of the child, as well. *In re C.H.*, 89 S.W.3d at 28.

### III.    ANALYSIS

Trish does not challenge the trial courts finding of predicate grounds (D), (E), (N), (O), (P), or (R). *See* TEX. FAM. CODE ANN. § 161.001(b)(1). Rather, by her sole issue, Trish challenges the trial court's termination of her parental rights on the basis that the evidence was legally and factually insufficient to support a finding that termination was in Kody's best interest. *See id.* § 161.001(b)(2). Trish argues that various *Holley* factors weigh against termination. *See Holley*, 544 S.W.2d 371–72. Specifically, Trish argues that: (1) "[t]he evidence presented at trial does not demonstrate an ongoing danger to [Kody] if [her] parental rights are not terminated; (2) "the evidence presented is clear that [Trish] loves [Kody] and is [sic] has a very strong bond with [him];" (3) the evidence relating to the stability of Trish's home and programs intended to assist her weigh against termination; (4) termination was not necessary to maintain Kody's placement with his foster mother, who was seventy years old and "had a negative home study" (future plans of the child); and (5) Trish was the "non-offending parent in this case." *See id.*

We note that Trish's testimony at trial conflicted with that of the other witnesses. For example, although Trish testified that she did not see or speak to Steve due to the risk he presented to Kody, Baeza testified that she saw Steve and Trish together on more than one occasion since the time Trish claimed to no longer speak to or see him. Further,

a text message sent from Trish to Baeza the month before trial indicated that Trish believed she contracted an illness from her contact with Steve. Baeza also stated that Trish reported to her that Steve hid in Trish's closet when Jordan visited Trish's home to prevent the Department from discovering they were still seeing each other. Additionally, the evidence showed that Steve is listed as a driver on Trish's auto insurance. Finally, Rincon testified that Trish disclosed to her in November 2021 that she relapsed on methamphetamine with Steve. Accordingly, the trial court could have disbelieved Trish's testimony and believed that of the other witnesses, supporting a finding that Trish may endanger Kody in the future by allowing a registered sex offender to be around him. *See Holley*, 544 S.W.2d 371–72; *see also In re A.M.*, 418 S.W.3d at 841.

Although Trish testified that she had "a very strong bond with [her] son" and had completed parenting classes, the Department presented evidence that Trish only attended fifteen of the ninety-seven in-person visits offered to her, repeatedly provided diapers and clothing that were the wrong size, and only attended one of his monthly doctor's appointments. This evidence supports a finding that Trish lacks the parenting abilities to raise Kody. *See Holley*, 544 S.W.2d 371–72; *see also In re A.M.*, 418 S.W.3d 841; *In re F.L.B.*, No. 13-19-00319-CV, 2019 WL 6606159, at *4 (Tex. App.—Corpus Christi–Edinburg Dec. 5, 2019, no pet.) (mem. op.) (considering mom's failure to attend medical appointments and visits when determining the child's best interest). On the other hand, both Jordan and Rincon testified that they had no concerns with Kody's placement in Baeza's home, that the two are well-bonded, and that she adequately cares for him. *See In re D.A.Z.*, 583 S.W.3d 676, 682 (Tex. App.—El Paso 2018, no pet.) ("Evidence

that a child is well-cared for by h[is] foster family, is bonded to h[is] foster family, and has spent minimal time in the presence of a parent is relevant to the best interest determination under the desires of the child factor.").

At trial and on appeal, Trish maintains that she was a "non-offending parent." We construe this argument as challenging the evidence supporting the factors which consider the parent's acts or omissions that may indicate the existing parent-child relationship is an improper one and any excuse for the parent's acts or omissions. *See Holley*, 544 S.W.2d 371–72. Despite Trish's testimony that she was not pregnant with Kody in February 2020, her medical records demonstrate that she was and that she received prenatal care during that time. Further, the records show that Trish tested positive for "[m]eth" but negative for "opiates," which would have included her methadone treatment. Initially, Trish claimed that she was not aware of Steve's sex offender status until after Kody was born, believing the charges were "thrown out." Subsequently, Trish testified that Steve's probation officer came to her home to provide her and Steve with a series of requirements as part of Steve's federal parole for a child pornography conviction.

Although Trish maintained that she completed the entirety of her family plan of service, Rincon testified that Trish missed forty-three drug tests throughout the case. "The trial court could reasonably infer [Trish] avoided taking the drug tests because she was using drugs." *See In re C.R.*, 263 S.W.3d 368, 374 (Tex. App.—Dallas 2008, no pet.). Furthermore, Trish admitted to relapsing on methamphetamine. The trial court could have disbelieved Trish's excuse that she was unaware of Steve's sex offender status and concluded that Trish's continued drug use and relationship with a sex offender indicated

12

that the existing parent-child relationship was improper. *See Holley*, 544 S.W.2d 371–72; *see also In re A.M.*, 418 S.W.3d at 841; *In re F.A.R.*, No. 11-04-00014-CV, 2005 WL 181719, at *4 (Tex. App.—Eastland Jan. 13, 2005, no pet.) (mem. op.) ("[C]ontinued drug use . . . demonstrates an inability to provide a stable environment for [the child] and an inability to provide for his emotional and physical needs.").

While the evidence showed that Trish maintained consistent housing throughout the case and was able to obtain further means of support, additional evidence indicated that she did not maintain stable employment and infrequently attended visits with Kody, utilizing various excuses. Furthermore, it is undisputed that Trish was previously involved with the Department twice over a period of several years due to her drug use, leading to the voluntarily termination of the parent-child relationship between her and two other children. Such evidence demonstrates some lack of stability on Trish's behalf. *See Holley*, 544 S.W.2d 371–72; *see also In re J.F.-G.*, 612 S.W.3d 373, 388 (Tex. App.—Waco 2020, no pet.) ("[A] factfinder can consider the parent's past neglect or past inability to meet the physical and emotional needs of their children."), *aff'd*, 627 S.W.3d 304 (Tex. 2021); *In re F.A.R.*, No. 2005 WL 181719, at *4 ("[Mother's] continued drug use . . . demonstrates an inability to provide a stable environment for [the child] and an inability to provide for his emotional and physical needs.").

In summation, the evidence presented at trial was both legally and factually sufficient to support a finding that termination was in the child's best interest by applying the *Holley* and statutory factors. *See In re A.C.*, 560 S.W.3d at 630–31; *see also* TEX. FAM. CODE ANN. § 263.307(b); *Holley*, 544 S.W.2d 371–72; *In re C.J.B.*, 137 S.W.3d 814,

820 (Tex. App.—Waco 2004, no pet.) ("The absence of evidence about some of [the *Holley* factors] does not preclude a factfinder from reasonably forming a firm belief or conviction that termination is in the child's best interest."). Further, although Trish presented alternatives to termination, such alternatives do not preclude a finding that termination is in the child's best interest. *See T.W. v. Tex. Dep't of Fam. & Prot. Servs.*, 431 S.W.3d 645, 651 (Tex. App.—El Paso 2014, not pet.) ("A separate consideration of alternatives to termination is not required."). We overrule Trish's sole issue.

## IV.    CONCLUSION

We affirm the trial court's judgment.

CLARISSA SILVA
Justice

Delivered and filed on the
13th day of October, 2022.

14